UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KING SPIDER LLC, et al,

                Plaintiffs,

        -against-

PANDA (HONG KONG) TECHNOLOGY CO.,
LTD., D/B/A PANDABUY,

                Defendant.

24-CV-2668 (JGLC)

**<u>OPINION AND ORDER</u>**

JESSICA G. L. CLARKE, United States District Judge:

Plaintiffs, several large apparel brands, allege that Pandabuy uses its website to assist consumers across the globe in purchasing counterfeit versions of Plaintiffs' products from third party e-commerce Chinese websites. When Plaintiffs first brought this action, they immediately sought an *ex parte* temporary restraining order ("TRO") against Pandabuy, seeking, among other relief, to prevent it from further selling Plaintiffs' counterfeit products and to freeze Pandabuy's assets. The Court granted the TRO and later converted it into a preliminary injunction (the "Preliminary Injunction"), after notice was given to Pandabuy. Pandabuy, however, did not appear to defend this action or contest the Preliminary Injunction until months later.

Now before the Court is Pandabuy's motion to dissolve or modify the Preliminary Injunction. Pandabuy argues that Plaintiffs are unlikely to succeed on the merits of their claims for direct trademark and copyright infringement. For the trademark claim, the parties dispute the role Pandabuy plays in facilitating the distribution and sale of Plaintiffs' counterfeit goods. And for the copyright claim, the parties disagree regarding whether Pandabuy "displays" infringing works within the meaning of the Copyright Act.

Because the evidence now before the Court indicates Pandabuy operates more like a passive facilitator than a seller or manufacturer, the Court must dissolve the Preliminary Injunction. The Court also finds Plaintiff's copyright claim is unlikely to succeed. As such, Defendant's motion to dissolve the Preliminary Injunction is GRANTED. In addition, Defendant's motion to seal certain information contained in materials submitted in connection with the instant motion (ECF Nos. 91 and 104, the "Sealing Motions") are GRANTED in part and DENIED in part. Finally, the Court GRANTS Plaintiffs' request to replace Exhibit A to the Amended Complaint with a corrected copy of the registration certificate for U.S. Copyright Registration No. VA 2-248-145 (and its corresponding deposit materials).

## BACKGROUND

The following facts are drawn from Plaintiffs' amended complaint, the parties' declarations and accompanying exhibits filed in connection with the Motion, and statements made by the parties' counsel during oral argument. *See Park Irmat Drug Corp. v. Optumrx, Inc.,* 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) ("In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence.") (internal citation omitted); *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) ("[H]earsay evidence may be considered by a district court in determining whether to grant a preliminary injunction."). The Court is not required to accept Plaintiffs' allegations as true or draw all reasonable inferences in their favor. *See New Hope Family Servs. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020).

Defendant Panda (Hong Kong) Technology Co., Ltd d/b/a Pandabuy ("Pandabuy") is an online shopping platform that allows consumers to purchase goods from third-party Chinese e-commerce platforms based in China which do not ship directly to the United States. ECF No. 54 ("Am. Compl.") ¶ 96. Consumers first create an account with Pandabuy and

provide their contact information and mailing address. ECF No. 96 ("Mao Decl.") ¶ 4.

Customers then copy links to product listings on a Chinese-language website and paste them

into Pandabuy's website. *Id.* ¶ 6. Pandabuy translates these links from foreign merchant

storefronts on Chinese e-commerce platforms into English, Korean, Chinese, or Spanish so

the user can read them. *Id.* Customers can also search, through Pandabuy's website, for goods

by product name or category, or by copying an image from a Chinese-language website. *Id.*

Pandabuy does not control or regulate the product listings from these third-party e-commerce

sites. *Id.* Pandabuy is not itself a marketplace: sellers do not list products directly on their

website. ECF No. 103 ("Bailey Decl.") ¶ 12.

Once a Pandabuy user identifies a product they wish to purchase, they make a payment

through PayPal, Stripe, Unlimint, or Antom, which is then routed through a custody account

held at World First Asia Limited ("WFHK"), a Hong Kong based financial institution (the

"WFHK Account") to a shopping agent company (the "Shopping Agent Company"). Mao

Decl. ¶ 7. Pandabuy engages the Shopping Agent Company through an agreement which

makes the latter responsible for servicing Pandabuy users. *Id.* ¶ 8. However, the Shopping

Agent Company has discretion to refuse orders, and it does not work exclusively with

Pandabuy. *Id.* ¶ 7. The Shopping Agent Company is responsible for recruiting and managing

individual shopping agents for providing services to users. *Id.* Pandabuy does not license any

of its technology to the Shopping Agent Company or the shopping agents. ECF No. 108 ("Lin

Decl.") ¶ 4. The Shopping Agent Company can interact with users and answer questions, and

generally facilitates the purchase and shipment of the desired product to a warehouse (the

"Warehouse"). Mao Decl. ¶¶ 7–8.

Pandabuy has an agreement with the Warehouse which involves granting access to its

logistics management system and platform. *Id.* ¶ 11. The Warehouse is operated by Huizhou

Yunchao Technology Co., Ltd. ("Yunchao"). ECF No. 109 ("Wang Decl.") ¶ 1. During the

2022-2023 period, Yunchao provided warehousing and logistics services to Pandabuy. *Id.* ¶ 6.

Starting from 2024, Yunchao only provided warehousing services to Pandabuy. *Id.* Once the

Warehouse receives the shipments, a Yunchao employee would scan the tracking number of

the parcel and record the brand of the product and the type of item. *Id.* ¶ 3. Then, as a form of

"quality control," the Warehouse unpackages, photographs, and sends the photographs to the

end consumer for review and approval. Mao Decl. ¶ 13. Upon approval and receipt of

shipping instructions from the consumer, the Warehouse repackages the products and ships

the products to the consumers. *Id*. The repackaged goods do not identify Pandabuy. *Id.* ¶ 15.

The users then make a second payment through the Pandabuy website, routed through the

World First Asia Limited account, which is in turn delivered to the shipping company. *Id.* ¶

14. Pandabuy receives a percentage of this payment as a fee.[1] *Id.*

Pandabuy uses social media to promote its website, including a now-discontinued

"affiliate program" (the "Affiliate Program"). Bailey Decl. ¶ 23. Through the program, social

media influencers would promote products sold through Pandabuy's website. *Id.* ¶¶ 23–27.

Pandabuy played no role in what goods or products the influencers selected. Lin Decl. ¶ 7.

Pandabuy also hosts a YouTube channel which provides tutorials and information on how to

shop on its website. Bailey Decl. ¶ 33.

Plaintiffs are the creators of various high end luxury brands selling men's and

women's apparel, accessories, bags, jewelry, and various other goods. Am. Compl. at i–v.

Plaintiffs each allege to have trademark protections, Am. Compl., Exs. A-F, and Plaintiff

---

[1] Prior to January 1, 2024, Pandabuy collected an 8% fee of the full amount of an *order*, not just the amounts paid for shipping. Lin Decl. ¶ 11.

Denim Tears also claims to have copyright protection. *Id.*, Ex. A. Plaintiffs allege that

Pandabuy endorses, encourages, and assists in the sale and transfer of counterfeit goods using

its website. Am. Compl. ¶ 97. Plaintiffs also assert the Pandabuy website depicts infringing

listings. *Id.* ¶ 111.

Since the commencement of this action, Pandabuy has altered its website to block

users from searching for Chinese website listings for products bearing the trademarks or brand

names at issue here. Mao Decl. ¶ 22. Pandabuy has also "altered its website to prevent the

display of images for product listings bearing Plaintiffs' marks and copyrighted work." *Id.*

However, as recently as September 11, 2024, at least some of Plaintiffs' products would

appear when searched for on Pandabuy's website. ECF No. 102 ("Drangel Decl.") ¶ 6.

## PROCEDURAL HISTORY

Plaintiff King Spider, LLC ("King Spider") filed this action on April 9, 2024 asserting

trademark and copyright infringement claims. ECF No. 17. King Spider moved for an *ex parte*

temporary restraining order ("TRO") on that same day. ECF No. 22. The first TRO was issued

on April 11, 2024. ECF No. 27. The First Amended TRO was issued April 16, 2024 (ECF No.

28), the Second Amended TRO was issued April 29, 2024 (ECF No. 29), and the Third

Amended TRO was issued May 16, 2024 (ECF No. 41). The Third Amended TRO was set to

expire on June 3, 2024, absent a showing of exceptional circumstances. ECF No. 41 at 17.

King Spider filed an Amended Complaint on June 20, 2024 adding several new plaintiffs and

asserting similar claims of trademark and copyright infringement. ECF No. 54.

On June 24, 2024, Plaintiffs filed a motion to continue the restraint on Defendant's

assets and for an order to show cause why a preliminary injunction should not issue. ECF No.

55. Defendant did not appear in the action or file any opposition, and the Court entered the

Preliminary Injunction on July 10, 2024. ECF No. 80. Among other things, the Preliminary

Injunction enjoined Defendant from (i) engaging in any direct or indirect infringement of

Plaintiffs' marks and works; (ii) listing, promoting, or otherwise advertising Plaintiffs' marks

and works; and (iii) knowingly instructing any person or business to do the same. *Id.* 10–11. It

also maintained the asset freeze in place from the prior TROs, which resulted in freezing

$16,841,342.38 in an account belonging to Pandabuy. *Id.* at 12–13; ECF No. 106

("Unredacted Lin Decl.") ¶ 34. The Preliminary Injunction allowed Defendant to appear and

move to dissolve or modify the injunction on two days' notice to Plaintiffs. ECF No. 80. at 16.

On August 19, 2024, Defendant filed the instant motion to modify or dissolve the

Preliminary Injunction. ECF No. 92. Oral argument was held on October 24, 2024. Neither

party sought an evidentiary hearing, and Plaintiffs denied one was necessary at this juncture.

Transcript of October 24, 2024 Oral Argument ("Oral Arg. Tr.") at 30:1-14.

## LEGAL STANDARD

### I.    Motion to Modify Preliminary Injunction

 "The decision whether to modify a preliminary injunction involves an exercise of the

same discretion that a court employs in an initial decision to grant or deny a preliminary

injunction." *Molecular Dynamics Ltd. v. Spectrum Dynamics Med. Ltd.*, No. 22-CV-4332

(PAE), 2022 WL 2901559, at *2 (S.D.N.Y. July 22, 2022) (quoting *Weight Watchers Int'l,*

*Inc. v. Luigino's, Inc.*, 423 F.3d 137, 141 (2d Cir. 2005)). To obtain preliminary injunctive

relief, the movant must show that: (1) they are "likely to succeed on the merits"; (2) they will

"suffer irreparable harm in the absence of preliminary relief; (3) "the balance of equities tips

in [movant's] favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def.*

*Council, Inc.*, 555 U.S. 7, 20 (2008) (citation omitted).

In the Second Circuit, the burden on a party seeking to modify a preliminary

injunction remains unclear. *See Sec. & Exch. Comm'n v. Xia*, No. 21-CV-5350 (PKC) (JAM),

2024 WL 3447849, at *10 (E.D.N.Y. July 9, 2024). Several district courts in this Circuit, as

well as other Courts of Appeals, have modified a preliminary injunction only when the

movant demonstrated a significant change in the operative facts or circumstances. *See*

*Ideavillage Prods. Corp. v. Bling Boutique Store*, No. 16-CV-9039 (KMW), 2017 WL

1435748, at *3 (S.D.N.Y. Apr. 21, 2017) (collecting cases)*; see also Lead Creation Inc. v.*

*Hangzhou Yueji E-Com. Co.*, No. 22-CV-10377 (JMF), 2023 WL 2403678, at *1 (S.D.N.Y.

Mar. 8, 2023) ("[M]odification or dissolution of an injunction is warranted where the changed

circumstances demonstrate that continuance of the injunction is no longer justified and/or will

work oppressively against the enjoined parties.") (internal citation and quotation omitted).

This Court will adopt the same standard and require that on a motion to modify a preliminary

injunction, the party seeking modification—here, Defendant Pandabuy—must show that at

least some "changed circumstances" warrant such relief. *Sprint Commc'ns Co. L.P. v. CAT*

*Commc'ns Int'l, Inc.*, 335 F.3d 235, 242 & n.8 (3d Cir. 2003).[2]

## II.     Motion to Seal

"The common law right of public access to judicial documents is firmly rooted in our

nation's history." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).

"The presumption of access is based on the need for federal courts . . . to have a measure of

accountability and for the public to have confidence in the administration of justice." *Id*.

---

[2] In its Reply, Defendant argues, for the first time, that the burden should be on Plaintiffs
because the "new facts" standard does not apply to a motion to modify a TRO issued on an *ex
parte* basis. ECF No. 107 ("Reply") at 2. That is not the posture of this case. While this Court
issued the Preliminary Injunction before the Defendant made an appearance, it was not issued
*ex parte*. Defendant received notice of Plaintiffs' application for a preliminary injunction, and
had an opportunity to appear and respond—Defendant merely failed to do so. *See Lead
Creation Inc.*, 2023 WL 2403678, at *1 (applying "new evidence" standard on Defendant's
motion to dissolve in similar procedural posture).

(quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)). "[M]otions to seal documents must be 'carefully and skeptically reviewed . . . to insure that there really is an extraordinary circumstance or compelling need' to seal the documents from public inspection." *Bernsten v. O'Reilly*, 307 F. Supp. 3d 161, 165 (S.D.N.Y. 2018) (quoting *Video Software Dealers Ass'n v. Orion Pictures*, 21 F.3d 24, 27 (2d Cir. 1994)). "The burden of demonstrating that a document submitted to a court should be sealed rests on the party seeking such action." *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997).

The Second Circuit has articulated a three-part test for determining whether the common law right of public access attaches. *See Lugosch*, 435 F.3d at 119–20 (2d Cir. 2006). First, a court must determine whether the documents at issue are "judicial documents" to which a presumption of access attaches. *Id*. at 119. Second, if the documents are judicial documents, a court must determine the weight of the presumption of access. *Id*. Third, a court must balance "competing considerations" against the weight of the presumption of access. *Id*. at 120.

In addition to the common law right of access, there is also a qualified First Amendment right to access judicial documents. *Id*. Under the First Amendment "experience and logic" test, the Court must consider whether the documents "have historically been open to the press and general public and whether public access plays a significant positive role in the functioning of the particular process in question." *Id*. (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 92 (2d Cir. 2004)). If a First Amendment right of access applies, documents may only be sealed "if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id*. (quoting *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)).

**DISCUSSION**

Defendant seeks to dissolve the Preliminary Injunction, or, in the alternative, to modify it so as to limit the amount of assets that should remain frozen. ECF No. 93 ("Mot.") at 2. For the reasons set forth below, the Court concludes that Defendant has met its burden, based on the evidence currently before the Court, in demonstrating Plaintiffs are not likely to succeed on their trademark and copyright infringement claims. Accordingly, the Preliminary Injunction is dissolved. As a result, the Court need not address the parties' arguments regarding modification of the asset freeze.

I.     **Defendant Has Offered "New Facts" To Establish Plaintiff is Not Likely to Succeed on their Direct Trademark Infringement Claims[3]**

Defendant asserts that it cannot be liable for trademark infringement because it merely operates as a passive facilitator. Mot. at 4–9. In assessing a claim for direct trademark infringement under the Lanham Act, courts look to (1) "whether the plaintiff's mark is entitled to protection" and (2) "whether the defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102 (2d Cir. 2010) (citation omitted).

Defendant has not seriously challenged that Plaintiffs' trademarks are entitled to protection. The Court therefore focuses on the second element: whether Defendant has made "use in commerce" of Plaintiffs' trademarks. "[I]n determining whether the plaintiffs have satisfied the 'use in commerce' requirement, we ask whether the trademark has been displayed to consumers in connection with a commercial transaction." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 306 (2d Cir. 2013). The term "use in commerce" is broad and has a sweeping reach, and

---

[3] Plaintiffs do not allege contributory or vicarious infringement claims against Defendant. *See* ECF No. 101 at 4. Defendant's arguments regarding these claims will therefore not be considered.

the issue must be assessed on case-by-case basis by considering the totality of the circumstances around the use of the mark. *See N. Star IP Holdings, LLC v. Icon Trade Servs., LLC*, 710 F. Supp. 3d 183, 207 (S.D.N.Y. 2024).

The Lanham Act, however, "does not necessarily apply to brokers, facilitators, or transactional intermediaries." *Atari Interactive, Inc. v. Printify, Inc.*, 714 F. Supp. 3d 225, 232 (S.D.N.Y. 2024), *appeal withdrawn sub nom. ABC v. Does 1-10*, No. 24-501, 2024 WL 3963729 (2d Cir. June 12, 2024). The critical question is where the alleged infringer—here, Defendant Pandabuy—falls on the following spectrum: does it "avoid liability by acting as a passive facilitator," or does it "exercise sufficient control over the creation, manufacture, or sale of offending goods to be considered akin to a 'seller' or 'manufacturer' to whom Lanham Act liability applies?" *Id.* (cleaned up). Defendant argues it is a "passive marketplace" because it does not take ownership of the goods, ship the goods, identify any goods with the Pandabuy name, advertise any products on its website, or regulate listings from third-party websites. Mot. at 5–8. Plaintiffs counter that all the relevant parties in the chain, including the Shopping Agent Company and the Warehouse, act as Pandabuy's agents and at their direction, and so Pandabuy is an "active participant" in every phase of the alleged infringement. ECF No. 101 ("Opp.") at 5–10. Plaintiffs also argue that the Lanham Act covers advertising and distribution, not just sales. *Id*. at 5–7.

The evidence before the Court, at this stage, is mixed, and Pandabuy does not fit neatly into either end of the spectrum. On the one hand, Pandabuy does not "represent itself" as a seller and does not identify any goods as its own. Indeed, customers typically identify products by copying links from *other* third-party websites. Mao Decl. ¶ 6. Thereafter, the Shopping Agent Company (which has discretion to refuse orders) purchases the products on the user's behalf. *Id*. ¶¶ 7–8. The Warehouse then quality checks the products, repackages

10

them, and communicates with customers regarding quality control approval and shipping

instructions. *Id.* ¶¶ 11–13. Pandabuy never affixes its own label to these packages, and

repackaged goods do not identify Pandabuy in any way. *Id.* ¶ 15. And Pandabuy's only

revenue comes in the form of a fee on shipping costs, which is similarly consistent with being

a passive facilitator. *See GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 464

(S.D.N.Y. 2011). Pandabuy's fee arrangement prior to 2024—which took into account the

entire order cost, rather than just the shipping costs—falls into a similar category. Lin Decl. ¶

11. These considerations weigh in favor of classifying Pandabuy as closer to a facilitator than

a true seller.

On the other hand, while it remains somewhat unclear at this stage of the litigation,

Pandabuy appears to exercise a significant degree of control over these processes. As

Defendant's counsel conceded at oral argument, the Warehouse and Shopping Agent

Company "are managed by Pandabuy." Oral Arg. Tr. 11:8-14. In other words, even though

Pandabuy *itself* does not directly purchase or ship the products, it contracts with the Shopping

Agent Company and the Warehouse specifically to service Pandabuy users and customers.

Moreover, the evidence before the Court suggests that Pandabuy itself *directs* users and

customers to the Shopping Agent Company. And Pandabuy gives the Warehouse access to its

internal systems. Mao Decl. ¶ 11. Customers also likely believe they are communicating with

Pandabuy throughout the process: as Defendant's counsel stated at oral argument, consumers

"are not told" the shopping agents work for a separate company. Oral Arg. Tr. 12:14-20. In

short, Pandabuy participates in the process by connecting consumers with third-party

products, who in turn correspond with two companies "managed" by Pandabuy. This degree

of control could suggest Pandabuy is more than a mere passive facilitator.

11

To resolve this issue of whether Pandabuy is covered under the Lanham Act, the Court looks to similar cases. *Printify*—another decision from this district—is instructive. Printify is a print-on-demand-service where merchants can design products by uploading images or choosing from images in Printify's existing library. *Printify*, 714 F. Supp. 3d at 229. Merchants would select an image and a product, then publish their products, adding it to Printify's database for purchase. *Id.* Printify did not review these products at any time in the process. *Id.* Once a consumer purchased a product, the order would be routed through Printify to a third-party printer, who would then manufacture the product and ship it to the consumer. *Id.* at 229–230. Printify never took possession of any inventory, and never saw the products before they were shipped to the customer. *Id.* The court, in denying the plaintiff's motion for a preliminary injunction, treated Printify as a passive facilitator, reasoning customers often purchased goods directly from the merchants, the orders did not arrive in Printify packaging, and Printify did not otherwise "identify the goods as its own." *Id.* at 233–34. Customers went through the entire purchase process—from browsing to ordering to receiving delivery—without any knowledge that the order was being facilitated by Printify. *Id.* at 234.

Like in *Printify,* Pandabuy acts more like a facilitator than a genuine seller. The key distinction between a direct seller who "uses" a trademark under the Lanham Act and a mere facilitator of sales who does not is the degree to which the party represents itself, rather than a third-party vendor, as the seller, or somehow identifies the goods as its own. *Printify*, 714 F. Supp. 3d at 233 (quoting *Ohio State Univ. v. Redbubble, Inc*., 989 F.3d 435, 448 (6th Cir. 2021)). Pandabuy does neither, and appears to only act as a valet between third-party e-commerce websites and the end user. Third-party merchants, not Pandabuy, generate, own, and manage any allegedly infringing listings, Mao Decl. ¶¶ 4–6, and Pandabuy "indicates to consumers that they are purchasing goods from third-party [merchants]." *Printify*, 714 F.

12

Supp. 3d at 233 (quoting *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 448 (6th Cir. 2021)).

It is also undisputed that Pandabuy plays no role in the "creation" or "manufacture" of any offending goods. *Printify*, 714 F. Supp. 3d at 229. While Pandabuy plays a role in the distribution process, *id.,* the evidence does not demonstrate Pandabuy acts more like a seller than a facilitator. For instance, Pandabuy does not maintain inventory, bear the risk of loss, and only collects money by fee, whereas a seller would typically "adjust[] price[s] in relation to the value of the goods in question." *Y.Y.G.M. SA v. Redbubble, Inc.*, No. 19-CV-4618 (RGK), 2020 WL 3984528, at *3 (C.D. Cal. July 10, 2020). Pandabuy, like *Printify,* also relies on other companies (the Shopping Agent Company and the Warehouse) to facilitate the transaction. *See Printify*, 714 F. Supp. 3d at 233 (observing "products [were] quality-checked by [a] third-party printer" and Printify engaged in "routine monitoring only to ensure that the printer [was] generally up to Printify's standards."). Even with certain points of distinction—e.g., Pandabuy consumers (unlike *Printify*) know they are interacting with Pandabuy, and Pandabuy plays a larger role in directing third parties than Printify did—based on the totality of the circumstances, *Printify* instructs that Pandabuy does not act as a true seller under the Lanham Act. Ultimately, Pandabuy's "use" of the marks is not "likely to cause consumers confusion as to the origin or sponsorship" of the goods from third party e-commerce websites. *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102 (2d Cir. 2010) (citation omitted).

*Atari Interactive, Inc. v. Redbubble, Inc.* and *H-D U.S.A., LLC v. SunFrog, LLC*—both discussed in *Printify*—further support this result. In *Redbubble*, the court denied both parties' summary judgment motions on direct infringement, finding that "while there is something much more than 'no evidence' that Redbubble acts as a seller, Atari has not established that Redbubble is a seller as a matter of law." 515 F. Supp. 3d 1089, 1105 (N.D. Cal. 2021). The

evidence showed that Redbubble had a role in selecting the physical products, taking responsibility for damaged goods and arranging replacements, handling excess inventory from returns, and delivering the products in Redbubble packaging with a Redbubble tag. *Id.* at 1102–1103. And in *SunFrog,* the court held that SunFrog could not escape liability for trademark infringement because, among other things, it "owns and runs its automated printers that print the infringing designs onto physical goods . . . . " *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1029–30 (E.D. Wis. 2018). The court also noted SunFrog "affixe[d] its own trademarks and logos onto the products," *id.* at 1014, and "encourage[d] and train[ed] its sellers" to use infringing designs. *Id.* at 1039–40. The defendants in *RedBubble* and *SunFrog* exhibited sufficiently more indicia of control—and presented more opportunity for consumer confusion by using their own tags and labels—than the evidence presently before the Court regarding Pandabuy.

In sum, the evidence currently before the Court suggests that Pandabuy does not "exercise sufficient control over the creation, manufacture, or sale of offending goods to be considered akin to a 'seller' or 'manufacturer' to whom Lanham Act liability applies." *Printify*, 714 F. Supp. 3d at 232 (citation and quotation omitted). While Plaintiffs may ultimately succeed on the merits, with the benefit of Defendant's appearance, affidavits, oral argument, and other new evidence, the Court is not persuaded at this early stage that Plaintiffs are *likely* to succeed on their trademark infringement claims.[4]

---

[4] This Court previously noted, in ruling on a summary judgment motion, that advertising itself can amount to trademark infringement. *See N. Star IP Holdings*, 710 F. Supp. 3d at 207. However, as discussed further with respect to Plaintiff's copyright infringement claim, and based on the evidence currently before the Court, Pandabuy does not "advertise" any products—it merely translates listings from third-party merchants, or algorithmically displays past purchases from other Pandabuy users. Mao Decl. ¶¶ 4–6, Lin Decl. ¶ 6.

**II.    Defendant Has Demonstrated that Plaintiff Denim Tears is Not Likely to Succeed on its Copyright Infringement Claim**

Defendant also argues that Plaintiff Denim Tears is not likely to succeed on their copyright infringement claim because Pandabuy's website does not "display" copyrighted material within the meaning of the Copyright Act. Mot. at 15–17. For the reasons stated below, the Court agrees.

To state a claim for copyright infringement, a plaintiff must show: "1) that his work is protected by a valid copyright,[5] 2) that the defendant copied his work, and 3) that the copying was wrongful." *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 100 (2d Cir. 2014). Section 106 of the Copyright Act "defines the 'exclusive rights' granted by the federal copyright law, which consist of the rights 'to do and to authorize' the reproduction, distribution, performance, and display of a work, and the creation of derivative works based on a work. *In re Jackson*, 972 F.3d 25, 43 (2d Cir. 2020) (quoting 17 U.S.C. § 106). "To display a work, under the Act, is to 'show a copy of it, either directly or by means of a film, slide, television image, or any other device or process.'" *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 588–89 (S.D.N.Y. 2018) (quoting 17 U.S.C. § 101). A copyright holder has the exclusive right to "transmit or otherwise communicate a display of the work to the public, by means of any device or process." *Id*. at 589 (quoting 17 U.S.C. § 101).

The Amended Complaint includes screenshots of a Denim Tears product, alongside an allegedly infringing listing from the Pandabuy website for a counterfeit product featuring a substantially similar product to the Denim Tears work. Am. Compl. ¶ 116. In determining whether Pandabuy "displayed" the Denim Tears product, the Court considers whether

---

[5] Plaintiffs ask to replace Exhibit A to the FAC with the corrected copy of the registration certificate for U.S. Copyright Registration No. VA 2-248-145 and its corresponding deposit materials. Opp. at 11 n.4. That request is GRANTED.

Pandabuy's website embeds images for display, or if it merely links to third party images—

i.e., whether the display can be characterized as "fair use." Under the "fair use" doctrine, "a

defendant who otherwise would have violated one or more of [a plaintiff's] exclusive rights

may avoid liability if it can establish that it made 'fair use' of the copyrighted material."

*Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570, 579 (S.D.N.Y. 2020) (*quoting Swatch*

*Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014)), *reconsideration*

*denied*, 565 F. Supp. 3d 400 (S.D.N.Y. 2021).

Courts have found defendants "displayed" work when they have copied embed code,

thereby embedding the work in their post. *See McGucken v. Newsweek LLC*, No. 19-CV-9617

(KPF), 2022 WL 836786, at *5–6 (S.D.N.Y. Mar. 21, 2022); *see also Nicklen v. Sinclair*

*Broad. Grp., Inc.*, 551 F. Supp. 3d 188, 196 (S.D.N.Y. 2021). On the other hand, a search

engine's display of thumbnail images in search results amounts to non-infringing fair use. *See*

*Authors Guild v. Google, Inc.*, 804 F.3d 202, 229 (2d Cir. 2015) ("Google's unauthorized

digitizing of copyright-protected works, creation of a search functionality, and display of

snippets from those works are non-infringing fair uses.").

Here, the images shown on Pandabuy's website are generated solely based on user

queries. Reply at 5–6. A consumer copies or creates an image which the consumer then pastes

into a search feature on the Pandabuy website. Lin Decl. ¶ 23. A page then appears showing

the same or similar images identified online, in thumbnail form. *Id*. "In the same way that

Google's shopping feature generates a set of images showing products that are for sale online

that correlate to the search terms the consumer used, a Pandabuy user would see a series of

similar thumbnail images." *Id*.

The Court finds that the images displayed on Pandabuy's website are akin to images

being collated by a Google search. Any lists listings displayed to Pandabuy consumers result

16

entirely from algorithmic and user driven behavior. Lin Decl. ¶ 6; Oral Arg. Tr. at 15:10-13. A user creating a search and having the option to click on the results is no different than how a Google search would operate. *See Milo & Gabby, LLC v. Amazon.com, Inc.*, No. 13-CV-1932 (RSM), 2015 WL 4394673, at *6 (W.D. Wash. July 16, 2015), *aff'd*, 693 F. App'x 879 (Fed. Cir. 2017) (concluding that Amazon was not liable for copyright infringement based on its sales and shipment of physical items because third-party sellers retain full title to and ownership of the inventory sold by the third party); *Lopez v. BigCommerce, Inc.*, No. 16-CV-8970 (JPO), 2017 WL 3278932, at *4 (S.D.N.Y. Aug. 1, 2017) (dismissing copyright claim against Google because display of images considered non-infringing fair use).

Accordingly, Defendant has met its burden in demonstrating Plaintiff Denim Tears is not likely to succeed on its copyright claim.

### III.    The Sealing Motion is Granted in Part and Denied in Part.

Finally, Defendant seeks to seal numerical figures and other sensitive information in the memorandum of law (ECF No. 95), Mao Declaration (ECF No. 96), Defendant's reply brief (ECF No. 107), and Lin Declaration (ECF No. 108)—as well as certain exhibits to the Lin Declaration—submitted in connection with the instant motion. ECF Nos. 91, 104. Defendant contends the documents contain "highly confidential business and financial information of Pandabuy, including its revenues, profits, commission fees, and customer deposit information," ECF No. 91 at 1, as well as its "personal identifying information and key word search information," ECF No. 104 at 1. Here, the Defendant seeks to seal or redact the following categories of information (the "Sealing Categories"):

1.  Asset amount (previously) frozen by the Court and consumer balances in Pandabuy's account (Mot. at 24, 25; Mao Decl. ¶ 30; Lin Decl. ¶ 34);

2.  Monetary value of orders placed from January 10, 2022 through April 11, 2024 (Mao Decl. ¶ 23; Lin Decl. ¶ 35);

17

3. Purchase price of orders shipped to the U.S. (Mot. at 24);

4. Direct costs associated with orders shipped to the U.S. in 2024 (Mao Decl. ¶ 28);

5. Direct costs associated with orders shipped to the U.S. in 2022 and 2023 (Mao Decl. ¶ 28);

6. Costs concerning server testing in 2022 and 2023 (Lin Decl. ¶ 33);

7. Interface fees of promotional links in 2022 and 2023 (Lin Decl. ¶ 33);

8. Revenue associated with orders shipped to the U.S. from January 10, 2022 through April 11, 2024 (Mao Decl. ¶ 26; Lin Decl. ¶ 35);

9. Revenue associated with orders shipped to the U.S. in 2024 (Mao Decl. ¶ 28);

10. Revenue associated with orders shipped to the U.S. in 2022 and 2023 (Mao Decl. ¶ 28);

11. Profits related to allegedly infringing products (Mot. at 2, 24, 25; Mao Decl. ¶ 27; Reply at 8; Lin Decl. ¶ 35);

12. Percentage of second payment that Pandabuy receives (Mao Decl. ¶¶ 14, 28);

13. Search term bans (Lin Decl. Ex. C);

14. Profit calculation for U.S. orders (Lin Decl. Ex. E);

15. Costs breakdown spreadsheet (Lin Decl. Ex. F); and

16. WFHK account screenshots (Lin Decl. Ex. G).

Defendant submitted the relevant documents and information in connection with its instant motion to dissolve, and so they are judicial documents subject to a strong presumption of access. *See Sylvania v. Ledvance LLC*, No. 20-CV-9858 (RA), 2021 WL 412241, at *1 (S.D.N.Y. Feb. 5, 2021). However, "[t]he demonstration of a valid need to protect the confidentiality of such sensitive business information may be a legitimate basis to rebut the public's presumption of access to judicial documents." *Lexington Furniture Indus., Inc. v. Lexington Co., AB*, No. 19-CV-6239 (PKC), 2021 WL 1143694, at *2 (S.D.N.Y. Mar. 24, 2021). "The party opposing disclosure [of a judicial document] must make a particular and

specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection . . . ." *In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 244 (S.D.N.Y. 2009). "[B]road allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test." *Id*.

Here, the Court does not reach the question of the asset freeze, and so the majority of the Sealing Categories are not truly central to its decision. Defendant nonetheless must identify a *specific* injury that would result from disclosure in order to justify sealing. At oral argument, Defendant pointed to the "general harm" from "any private company having its financials laid bare" and the risk other potential plaintiffs would use the information against Pandabuy. Oral Arg. Tr. 4:12-16. In light of the foregoing, the Court will deny the motion as to information discussed or relevant to this decision (and its prior decisions), and grant the sealing motion as to "categories commonly sealed, [such as] those containing trade secrets, confidential research and development information, marketing plans, revenue information, pricing information, and the like." *Tyson Foods, Inc. v. Keystone Foods Holdings, Ltd*., No. 19-CV-010125 (ALC), 2020 WL 5819864, at *2 (S.D.N.Y. Sept. 30, 2020) (citation omitted).

Accordingly, after careful consideration, the Defendant's motion is denied as to Sealing Categories 1 (only as to the amount previously frozen), 2, 11, 12, and 16 (but Defendant may redact account numbers and other identifying information). The motion is granted as to the remaining Sealed Categories.

## CONCLUSION

Defendant's motion is GRANTED, and the Preliminary Injunction previously entered on July 10, 2024, is hereby DISSOLVED. Defendant's motion is otherwise DENIED as moot. Defendant's Sealing Motion is also GRANTED in part and DENIED in part. Defendant is directed to re-file the documents referenced in the Sealing Motion in a manner consistent with

this Order no later than January 24, 2024. Finally, Plaintiffs' request to replace Exhibit A to

the Amended Complaint with a corrected copy of the registration certificate for U.S.

Copyright Registration No. VA 2-248-145 (and its corresponding deposit materials) is

GRANTED.

   The Clerk of Court is respectfully directed to terminate ECF Nos. 91, 92, and 104.


Dated: January 14, 2025
      New York, New York

                                    SO ORDERED.

                                    JESSICA G. L. CLARKE
                                    United States District Judge